We move to the second case this morning, Martin v. Kijakazi. Sutterfield? Yes, thank you. May it please the court and council, I am attorney David Sutterfield, I represent Plaintiff Gordon Appellant Gordon Martin. It's the position of Mr. Martin that the Administrative Law Judge erred in his application of SSR rule in 18-01P. The Commissioner's doctor, Dr. Holand, testified in reviewing the PFT studies in this case that Mr. Martin would have shown a steady improvement in his lung function. If one then compares that to like a swimming pool, meaning the lower levels of the listing numbers are like the surface of a pool of water in a swimming pool, Mr. Martin's always underneath that pool of water. He's always underneath that surface. He was not going to breathe appropriately and there's no evidence to the contrary. But Mr. Sutterfield, here's the problem. I think I understand your theory, you know, that he has these pulmonary function tests done in the 1990s and then there's a long hiatus and he finally has another one done in August 2010 and your theory looking at this testimony is that there's sort of a smooth line between wherever he was after his medical procedures and so on and where he was in 2010 and he never kind of got above what you're calling the surface of the pool. But this is pretty weak evidence for that and there is other evidence that the administrative law judge relied on showing that he did have some capability. And of course, that's the real question. Even though you have physical problems or in some instances, not this case, mental problems, what can you do despite that? And he's going out on family outings. He's going to Six Flags. He doesn't start using portable oxygen until 2014, long, long after state last insured. So what was wrong with the administrative law judge's reliance on the medical experts who didn't buy your kind of smooth curve up and always below the listing level theory? First of all, he brought in this expert for that particular reason to give the global perspective. That had not been done. And to say, I'm going to uh, he, uh, the August, 2010 testing demonstrated he clearly met a listing. He wasn't actually in that either. After he met the, uh, listing in August of two, I'm sorry, December, 2014. This use of oxygen was only when he arose from the chair and got up. The problem with the 2010, I mean, I guess just to get back to this, look, this is a person who has a lot of trouble, you know, with his pulmonary function. There's no doubt about that. But the question before us is a somewhat narrower one, which is had he, had he enough impairment by December 31st, 1997, his date last insured to meet the listing or otherwise to qualify for benefits. And so we're, we're forced to do a lot of extrapolation backwards in this case. And the ALJ doesn't think he put enough evidence in there to show that he was indeed, you know, some, somebody who met or equaled either way, met or equaled the listing at the end of 97. The factors you just identified though, are not part of the listing. They're not there's a mixing of step four and step five with step three. Step three is a standalone analysis and step three, you have testimony from their doctor that he would have had steady improvement. There is no evidence that he ever got above the listing. He's so far underwater in, in 93 that if you doubled the FVC finding that it would still meet the listing requirements for, for 3.02B. But wasn't the, wasn't the ALJ concerned about the fact that the tests that were done in 1992 were done right after he had been in the hospital for other things and the, the regs require 30 days afterwards or something along those lines. Correct. And he's so far below that that's really a non-issue, particularly when you have their expert come in and saying there would have been steady improvement. So we move out 60 days. There's way based on steady improvement that he is going to not meet a listing. It's not going to happen. So who said that? I mean, where, what's your record evidence for that? Dr. Holman testified there's steady improvement. He doesn't say he would have rapidly increased and then over the years he would have maintained that level and then would have slowly decreased. And here he is in August of 2010, he didn't testify to that. He testified there would have been a steady improvement and he also characterized the results in March of 1993 as slightly low in terms of looking at his overall condition being in the hospital that his, the circumstance of him being in the hospital would have slightly skewed those results slightly low. That's his characterization. The judge has to analyze that. The judge can't mix step fours and step five with this analysis step three. He's got the SSR. I'm sorry, drawn a blank. 18-01P requires that the judge do that analysis. You go back. When do we know he met a listing? We know that these, he met a listing based on the testimony of our expert, their expert, and he's got to go through that analysis. He can't just ignore that. He has to comply with the SSRs. And again, if he's meeting a listing in August of 2010 and not using oxygen for another four years, that again shows the lack of reliability of what the judge did. Namely, well, he did this, he did that, whatever. Again, there, without going into details, there's numerous descriptions by Mr. Martin as to the manner in which he performed those items. And there wouldn't be consistent with sustained work activity. Mr. Sutterfield, can I ask you to address the second issue for just a minute here? Sure. The government makes the point that ALJ identifies jobs in the national economy, and we're just sort of extrapolating the weather from Springfield and saying there are certain days in which it's hot. Some summers it's not, you know, some summers we get a cool summer or we get a warm winter. And I just, is that anywhere near enough for us to reverse? Well, if you get into the RFC, I understand the issues that you've raised there. But again, we're talking about heat and cold. Both of them cause him to, when they get below the outside the parameters of his tolerance, he's not going to show up for work. And their doctor, again, those are accurate. There's no testimony regarding that application of weather outside of his locale. But again, I think he could take numerous places in this country. And I think that either the heat is displaced by the cold or the cold is displaced by the heat. You're still going to run into circumstances where he's going to miss excessive days. But a lot of places, a lot of places you aren't. And the other thing is if he worked in the air-conditioned or a heated environment, he had to get in his car in the garage and drive to his work and park and go into work. I just don't, you know, I guess I just don't, I'm having trouble with that, with the evidence in the record. There, but there's no evidence about him being able to get in and out of a vehicle and where he would be in terms of his exposure to the heat and the cold. He hadn't, he testified he had a near incident response to those elements. So there isn't, you know, from his, from the parking lot of the place of employment to get into the, to get into the place of employment. Those are still considerations. I will reserve. Thank you. Thank you. Ms. Hahn. May it please the court. Lou Hahn on behalf of the Commissioner of Social Security. I'll start with the biggest picture here, which is the fact that the ALJ complied with the Social Security Act, the regulations, the rulings, and the sub-regulatory materials that apply to ALJ decisions. This decision went through all five steps of the sequential evaluation process. The step three finding is the bulk of Mr. Martin's argument. And that was but one step in the five steps. The burden was always with Mr. Martin to prove that he satisfied, met or medically equaled a listing as well as through all five steps to show that he was disabled. So can I ask you though, Ms. Hahn, we do have Dr. Holan saying that steady improvement in his lung function between 1993 and 2010 was expected. And at both of those endpoints, 1993 and 2010, his pulmonary function met the listing. So why isn't it a mistake for the administrative law not to explain why, even though the steady improvement testimony was there in the record, why that doesn't put him at a listing qualified level as of his date last insured? Respectfully, Your Honor, the ALJ did discuss Dr. Holan's medical expert testimony and did explain the reasons for not finding that Mr. Martin met or medically equaled listing 3.02. Specifically, the listings themselves, listing three, which encompasses the chronic respiratory conditions that Mr. Martin claims he had listing level severity. And within listing three, the listings specifically exclude tests that were taken when an individual is not medically stable. The ALJ thoroughly discussed that and referenced Dr. Holan's own testimony that during the four-month hospitalization for an acute infection, Mr. Martin would have been weaker. He had nutritional deficiencies and that his performance on the tests would have been lower than expected. And that's exactly what the listings themselves contemplate and exclude those test results taken when an individual is not medically stable. And he wasn't trying to rely on those, but the fact is that even the 2010 test, which has no such flaw about the hospitalization issue or the like, is at a level which is, which meets the listing. And there's no testimony to say that the 1993 test was completely worthless. He just said it was a bit low. It was falsely low considering his illness at the time. But Dr. Golub still thinks that he equals listing 3.02 during the coverage period. Your Honor raises the interrogatories by another expert from the prior ALJ decision, Dr. Golub. Yes, Dr. Golub's interrogatories, the ALJ also discussed. This ALJ's decision covers those opinions, which say that the equivalency to listing 3.02 was relying on the fact that Mr. Martin was using supplemental oxygen. And that point Your Honor did already raise, which is that sometime around 2008, Mr. Martin ceased to smoke between a pack to a pack and a half of cigarettes a day. And it seems as though around 2014, per his testimony, he himself says he did not start the supplemental oxygen until 2014, which is decades after the date last insured. Dr. Golub therefore premised the finding of medical equivalency on a factual misunderstanding. The ALJ thoroughly explained that, and it is notable that before the court below and before this court, Mr. Martin isn't arguing that the ALJ made any mistakes with regard to the evaluation of the medical opinion evidence from Dr. Golub. The ALJ discounted that interrogatory evidence, and the ALJ relied on the more recent testimony by Dr. Holin at the January 2020 hearing. It's telling that Dr. Holin in his testimony, after discussing the test results from the spirometry pulmonary functioning testing, in response to an ALJ's question about work abilities during the relevant time, Dr. Holin actually provided a host of abilities that matches the ALJ's decision, such as frequently being able to lift less than 10 pounds and the like. And your honor's correct. At no point did even the ALJ suggest that the 1993 test results or any of the medical evidence, of which there was plenty in this case, didn't suggest any was irrelevant or worthless by any means. The ALJ, in his assessment of Mr. Martin's work abilities, included limitations against pulmonary irritants, environmental limitations, limitation against humidity and temperature extremes, which actually goes to- He's failing in early 1994. It seems to me all people should have a lawyer by their side. In early 1994, when he has the follow-up visit with Dr. Belcher, he should have had a pulmonary function test, and Dr. Belcher didn't apparently order one. That's correct. There just is a long period of time between the March 1993 test, which came at the tail end of a four-month hospital stay, and then the next test, which doesn't occur until 2010. The April 1994 statement from Dr. Belcher, who is the VA doctor who treated Mr. Martin while he was under the care of VA hospital, that really was procured because of a requirement from the Department of the Army. Mr. Martin was, and I believe is still receiving benefits as a retired service member. And because of those retirement benefits, he's required to get periodic medical exams. Dr. Belcher's opinion is also one that the ALJ evaluated, explained reasons for discounting. And again, Mr. Martin has waived or forfeited any objection to the ALJ's evaluation of that opinion testimony. The ALJ here thoroughly explained the evidence that supported the Step 3 finding. The ALJ moved on to the next steps. In between Steps 3 and 4 is commonly, as this Court has seen, that part of the decision that assesses an individual's work abilities. And here, the ALJ thoroughly explained the evidentiary basis for his finding that Mr. Martin could do a reduced range of sedentary work. With that, the ALJ found Mr. Martin couldn't do past work, but at Step 5, with the assistance of another expert, a vocational expert, the ALJ found that there were over 340,000 jobs that Mr. Martin or someone with his work abilities could still perform. In going to that second issue, it was Congress's intent, and in framing the Social Security Act, that this is a nationwide program. And whether or not I or any of us agree with that, it is the purpose of the Social Security Act to have uniformity and consistency throughout the nation so that an individual who is found disabled in Southern California would also have the same steps being applied if that individual were to live in Anchorage, Alaska, for example. Therefore, the information on weather patterns and extremes in Springfield, Illinois, really not pertinent to the ALJ's Step 5 decision in this case, which is that with those environmental temperature humidity limitations, Mr. Martin could still do a significant number of jobs. The ALJ here proceeded through all five steps of the sequential evaluation process. Mr. Martin has not shown that the ALJ acted unreasonably at any step along the way. And that is the standard for this court to evaluate in order to remand this back to the agency. The question is, did the ALJ act wholly without reason? And it is our contention that the ALJ did act reasonably. Unless there are any additional questions from the panel members, the Commissioner rests on the arguments she made in her brief, and we ask that this panel affirm the decision of the ALJ. Thank you, Ms. Hahn. Mr. Sutterfield? Thank you very much. The ALJ did not act reasonably. He ignored the testimony of Dr. Holand that the results in 2003, I'm sorry, 1993, were slightly skewed, and there's been a steady improvement thereafter. That's not reasonable to simply ignore that. With regard to the oxygen in this issue, Dr. Golub in particular, again, he's mixing apples and oranges. Use of oxygen is not part of the listing. And again, in fact, the record demonstrates that when Mr. Martin met the listing in 2010, he was not using oxygen, didn't use oxygen for another four and a half years. So that, and then again, I think at the end, the ALJ is mixing step three with step five. That's not permissible. He has to do a thorough analysis of step three, utilizing the requirements of list of SSR 18-01P, erred by not doing so. We ask that Mr. Martin's petition be granted, and the case remanded for re-hearing. Thank you. Thanks to both Council, and the case will be taken under advisory.